UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CHRISTOPHER JUNE,

                                Plaintiff,
                                                        9:09-CV-0323
v.                                                      (FJS/GHL)

D. BLAIR, MICHAEL HOGAN,
ELIZABETH FARUM, DONALD SAWYER,
TERRI MAXAMILLION, ERIK SCOLOSSER,
JEFFREY NOWICKI, YOLONDA PERONI,

                                Defendants.
_____

APPEARANCES:                            OF COUNSEL:

CHRISTOPHER JUNE, 545846
Plaintiff *pro se*
Central New York Psychiatric Center
P.O. Box 300
Marcy, NY 13403

HON. ANDREW M. CUOMO                     AARON M. BALDWIN, ESQ.
Attorney General for the State of New York
  Counsel for Defendants
The Capitol
Albany, NY 12224

GEORGE H. LOWE, United States Magistrate Judge

**ORDER and REPORT-RECOMMENDATION**

        This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin,

Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

Plaintiff Christopher June alleges that he was unconstitutionally committed to the Central New

York Psychiatric Center ("CNYPC") and that he was subjected to unconstitutional conditions of

confinement at the facility.  Currently pending before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Dkt. No. 39.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I.     BACKGROUND

### A.     Plaintiff's Commitment to CNYPC

On January 12, 2004, Plaintiff pleaded guilty to one count of violating New York Penal Law § 130.65(3) (sexual contact with a person less than eleven years of age).  (Dkt. No.1 Ex. K; Defs.' Ex. A.[1])  Under New York law, the maximum sentence for this crime is seven years. N.Y. Penal Law §§ 70.00(2)(d), 130.65.  On April 5, 2004, Plaintiff was sentenced to serve two and a half years in state prison, followed by three years of post-release supervision.  (Defs.' Ex. A.)  Plaintiff was scheduled to be released from custody on supervised release on May 8, 2006.

---

[1]     Defendants request judicial notice of several documents from state court proceedings involving Plaintiff that are relevant to this action.  (Dkt. No. 39-1 at 1 n. 1.)  Under Federal Rule of Evidence 201, "[a] court may take judicial notice, whether requested or not" of a fact "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)-(c); *U.S. v. Bari*, 599 F.3d 176, 180 (2d Cir. 2010).  A court may take judicial notice of a document filed in another court to establish the fact of such litigation and related filings, but not for the truth of the matters asserted in the other litigation.  *Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992); *see also Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts . . . to establish the fact of such litigation and related filings.").  Courts also may take judicial notice of another court's order to recognize the judicial act the order represents or the litigation subject matter.  *See City of Amsterdam v. Daniel Goldreyer, Ltd.*, 882 F. Supp. 1273, 1279 (E.D.N.Y. 1995) (*citing U.S. v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994)).  Therefore, I grant Defendants' request for judicial notice.  I note that Plaintiff attached many of the same documents to his complaint.

(CITE.)

On or about May 1, 2006, two psychiatrists examined Plaintiff pursuant to Mental Hygiene Law § 9.27.  (Defs.' Ex. B ¶ 3.)  That statute provides for the involuntary commitment of "any person alleged to be mentally ill and in need of involuntary care and treatment."  An application for such an involuntary commitment must be made by an individual with personal knowledge and must be accompanied by the certificates of two examining physicians.  Mental Hyg. Law § 9.27 (a) - (b).  A doctor at the receiving must examine the patient and confirm the findings of the certifying physicians.  *Id*. at (e).  Under this statutory scheme, the patient is not entitled to a hearing until after he or she has been involuntarily committed.  Mental Hyg. Law § 9.31.  A patient may demand a hearing within sixty days of his or her involuntary commitment.  Mental Hyg. Law § 9.31.  If no such demand is made, the patient may be held for a maximum of sixty days, unless the director of the facility applies for a court order authorizing continued retention for up to six months.  Mental Hyg. Law § 9.33.  Upon receipt of such an application, the patient may demand a hearing on the need for involuntary retention.  Mental Hyg. Law § 9.33(a).  Mental Hygiene Law § 9.33(a) authorizes the hospital to retain the patient while the retention application is pending.  If the court grants the retention application, the patient may demand a rehearing and review of the prior proceeding before a jury.  Mental Hyg. Law § 9.35.  At the end of any initial six-month court-ordered retention, the director of the facility, following the same procedures, may obtain a retention order effective for up to an additional year.  Mental Hyg. Law § 9.33(d).

Plaintiff alleges that on May 5, 2006, he was instructed to go to the medical department at Marcy Correctional Facility.  (Dkt. No. 1 ¶ 10.)  When Plaintiff arrived, a nurse examined him.

*Id*. ¶ 11.  After the examination, Plaintiff was instructed to remain in the medical department until he was seen by a sergeant.  *Id*. ¶ 12.  When the sergeant arrived, he handcuffed Plaintiff and informed him that he was being sent to the Special Housing Unit ("SHU").  *Id*. ¶ 13.  Plaintiff was then transported to the SHU.  *Id*.  When he arrived at the SHU, he was strip searched and verbally threatened and harassed.  *Id*. ¶¶14-15.  At one point, he was pushed into the wall he was facing.  *Id*. ¶ 15.

Once he was in his cell in the SHU, Plaintiff asked to see a lieutenant.  (Dkt. No. 1 ¶ 17.) When the lieutenant arrived, Plaintiff asked why he had been detained in the SHU.  *Id*. ¶ 18.  The lieutenant told Plaintiff to "fuck off" and walked away.  *Id*.

On May 8, 2006, Defendant D. Blair, a parole agent, came to see Plaintiff in the SHU. (Dkt. No. 1 ¶ 19.)  He presented Plaintiff with a "Certificate of Release to Parole Supervision." *Id*.  Plaintiff alleges that the document originally reflected that Plaintiff would be paroled to an apartment in Union Center, New York, for which Plaintiff's father had completed a lease and paid a deposit on March 1, 2006.  *Id*. ¶ 29,  Ex. B.  Plaintiff and Defendant Blair each signed the Certificate of Release.  *Id*. ¶ 22.  When Plaintiff requested a copy, Defendant Blair ripped the document out of Plaintiff's hand and told him that he would get a copy.  *Id*.  Defendant Blair returned about an hour later, threw a copy of the document at Plaintiff, and left without further explanation.  *Id*. ¶ 23.  Plaintiff examined the document and discovered that his Union Center address had been whited out and replaced with the words "Central New York Psychiatric Center."  *Id*. ¶ 26.  Plaintiff immediately advised two corrections officers that there was a problem with the document.  *Id*. ¶ 25.

Later that day, Plaintiff was transported to CNYPC for an initial sixty-day commitment

pursuant to Mental Hygiene Law § 9.27.  (Dkt. No. 1 ¶ 27, Ex. K.)

On June 27, 2006, ten days before the expiration of Plaintiff's initial sixty-day commitment at CNYPC, Defendant Donald Sawyer applied, pursuant to Mental Hygiene Law § 9.33, to retain Plaintiff for an additional six months at CNYPC.  (Dkt. No. 1 Ex. K ¶ 3; Defs.' Exs. C, G.)  Plaintiff, through counsel, contested the application. (Dkt. No. 1 Ex. K ¶ 3.)

On October 10, 2006, Defendant Yolonda Peroni conducted a Treatment Plan Review. (Dkt. No. 1 ¶ 39.)  Defendant Peroni found that Plaintiff suffered from pedophilia and a personality disorder.  *Id.* ¶ 40.

On November 21, 2006, the New York Court of Appeals held that Mental Hygiene Law Article 9's procedures could not properly be used for individuals, like Plaintiff, who were serving a prison sentence immediately before being civilly committed.  *New York ex rel. Harkavy v. Consilvio* (*Harkavy I*), 7 N.Y.3d 607 (2006).  Rather, the court held that officials were required to comply with Correction Law § 402.  *Id.* at 614.  Correction Law § 402 sets forth the procedure for involuntarily civilly committing "any person undergoing a sentence of imprisonment." Correct. Law § 402(1).  It requires examination by two court-appointed physicians, court approval of the commitment order after notice to the inmate, and a pre-commitment hearing at the inmate's request before a prisoner can be civilly committed.  *Id.*  The Court of Appeals directed that any

> petitioners remaining in OMH custody be afforded an immediate retention hearing pursuant to article 9 of the Mental Hygiene Law – now controlling – since they are no longer serving a prison sentence. As for future candidates for immediate psychiatric hospitalization, prior to the expiration of a term of imprisonment, the State must proceed pursuant to Correction Law § 402, with all its attendant procedural requirements including court supervision, pretransfer

> notice and an opportunity to be heard within a reasonable period of
> time prior to the inmate's proposed release date.

*Harvavy I*, 7 N.Y.3d at 614 (citation omitted).

One week later, Plaintiff's Mental Hygiene Law § 9.33 hearing was conducted in Supreme Court for the County of Oneida.  (Defs.' Ex. C.)  Plaintiff alleges that Defendant Scolosser, who was part of Plaintiff's treatment team at CNYPC and met with Plaintiff daily, "openly testified against the plaintiff" at the hearing.  (Dkt. No. 1 ¶¶  80-81, 89.)  In his testimony, Defendant Scolosser "intentionally twist[ed] certain facts that the plaintiff . . . offer[ed] in group sessions so as to make the plaintiff look foolish, stupid, and not credi[ble]." *Id*. ¶ 88.  Plaintiff alleges that Defendant Scolosser falsely accused Plaintiff's mother of being an alcoholic.  *Id*. ¶ 91.  Plaintiff alleges that, at the hearing, Defendant Scolosser "took the position that even though the plaintiff participated in the Sex Offender Program at Gowanda Correctional Facility, that didn't mean anything."  *Id*. ¶ 92.  Plaintiff alleges that Defendant Scolosser was acting in concert with Defendant Elizabeth Farum.  *Id*. ¶ 82.

On November 30, 2006, Supreme Court for the County of Oneida issued an order pursuant to Mental Hygiene Law § 9.33 directing that Plaintiff be retained for an additional six months at CNYPC.  (Defs.' Ex. C; Dkt. No. 1 Ex. K ¶ 3.)  Plaintiff moved for a rehearing pursuant to Mental Hygiene Law § 9.35.  (Defs.' Ex. D.)  The rehearing was never conducted. On February 3, 2008, a stipulation of discontinuance was filed officially withdrawing the Article 9 petition.  (Defs.' Ex. H.)  Plaintiff remained confined at CNYPC.

On April 13, 2007, in response to *Harkavy I*, New York enacted Article 10 of the Mental Hygiene Law.  Article 10 created a new procedure for civilly committing sex offenders nearing

6

the end of their prison terms.  Under Article 10, when a sex offender is nearing release, DOCS must, "at least one hundred twenty days prior to the person's anticipated release," give notice to the state attorney general and commissioner of mental health.  Mental Hyg. Law § 10.05(b). The commissioner of mental health is then authorized to designate multidisciplinary staff to review the individual's records to determine whether he should be referred to a case review team for evaluation.  *Id.* at (d).  If the individual is referred to a case review team, notice must be provided to him.  *Id*. at (e).  If the case review team finds that the individual is a "sex offender requiring civil management," it must notify the attorney general and the individual in writing.  *Id*. at (g). The attorney general may then file a petition in the supreme court or county court of the county in which the individual is located, seeking to detain the individual in a psychiatric institution. Mental Hyg. Law § 10.06(a).  Within thirty days of the filing of a petition, a court shall conduct a probable cause hearing.  Mental Hyg. Law § 10.06(g).  At the probable cause hearing, a judge must determine whether there is probable cause to believe that the individual may have a mental abnormality.  No finding of current dangerousness is required.  Mental Hyg. Law § 10.06(k).  If the judge finds probable cause, the individual "shall not be released pending the completion of [the] trial."  *Id*.  The trial shall be conducted within sixty days of the finding of probable cause. Mental Hyg. Law § 10.07(a).  At the trial, the jury shall determine by clear and convincing evidence whether the individual is a detained sex offender who suffers from a mental abnormality.  Mental Hyg. Law § 10.07(d).  If the jury determines that the individual is a detained sex offender who suffers from a mental abnormality, "the court shall consider whether the [individual] is a dangerous sex offender requiring confinement or a sex offender requiring strict and intensive supervision."  *Id.* at (f).  The court may then either order the individual

7

committed to a secure treatment facility or subjected to a regimen of strict and intensive supervision and treatment.  *Id.*

On November 9, 2007, the New York State Attorney General's Office filed a petition seeking to detain Plaintiff pursuant to Mental Hygiene Law Article 10.  (Dkt No. 1, Ex. J; Defs.' Ex. G.)   The petition alleged, based in part on results of a "STATIC-99" test, that Plaintiff was 52% likely to re-offend within a six-year period.  *Id.* ¶ 11.  Plaintiff alleges that STATIC-99 "is not permitted to be considered in . . . New York State" and that it "was mis-applied and unlawful."  (Dkt. No. 1 ¶ 121.)

One week later, on November 16, 2007, the United States District Court for the Southern District of New York ("the Southern District") issued an order stating that it intended to issue a preliminary injunction barring then-governor Elliot Spitzer, Attorney General Andrew Cuomo, Michael Hogan[2], Diana Jones Ritter, and Brian Fischer from enforcing two provisions of Article 10, including the provision that mandates detention in the period between the probable cause hearing and the commitment trial even without a finding of current dangerousness.  *Mental Hygiene Legal Serv. v. Spitzer*, No. 07 Civ. 2936, 2007 U.S. Dist. LEXIS 85163, 2007 WL 4115936,  *aff'd by Mental Hygiene Legal Serv. v. Paterson*, No. 07-5548-CV, 2009 U.S. App. LEXIS 4942, 2009 WL 579445 (2d Cir. Mar. 4, 2009).

Plaintiff's probable cause hearing was conducted nineteen days later, on December 5, 2007.  (Defs.' Ex. I.)  The judge found that there was probable cause "to believe that [Plaintiff] is a sex offender requiring civil management under Article 10" and ordered that Plaintiff be held at CNYPC pending trial.  *Id.*  Despite the Southern District's order, the judge did not make a

_____

[2]        Michael Hogan is a defendant in this action.

8

finding that Plaintiff was currently dangerous. *Id*. Trial was set for March 18, 2008. *Id*. As discussed further below, it does not appear that, to date, the trial has ever been conducted.

On December 10, 2007, the Southern District issued the preliminary injunction contemplated in its November 16, 2007, order. The court ordered that no individual could be detained pending an Article 10 trial "unless the court that directed his confinement has made or subsequently makes a specific, individualized judicial finding of probable cause to believe that the person is sufficiently dangerous to require confinement, and that lesser conditions of supervision will not suffice to protect the public during the pendency of the proceedings." *Mental Hygiene Legal Serv. v. Spitzer*, No. 07-Civ-2935, Dkt. No. 41 at 1.[3] The court noted that any individual who was confined "on the effective date of this order without the requisite findings . . . will remain so confined unless and until he makes a request for release, to the court that directed his confinement, on the grounds that there is not probable cause to believe that he is sufficiently dangerous to require confinement or that lesser conditions of supervision will suffice to protect the public during the pendency of the proceedings." *Id*. at 1-2. On the date of the Southern District's decision, as discussed above, Plaintiff was an individual confined "without the requisite findings."

On May 8, 2008, Plaintiff was arrested for assaulting a CNYPC staff member. (Defs.' Ex. K.) On June 12, 2008, he pleaded guilty and was sentenced to time served. *Id*. On June 30, 2008, the Parole Board revoked Plaintiff's post-release supervision on his original 2004 conviction and returned him to DOCS custody. *Id*.

---

[3]     The Southern District's preliminary injunction order is not available on either Westlaw or LEXIS. I have cited the docket number from the Southern District's electronic filing system.

On February 18, 2009, Plaintiff moved, through counsel, to dismiss the Article 10 petition. (Defs.' Ex. K at 1.) Plaintiff argued that by confining him to DOCS custody when his parole was revoked rather than retaining him at CNYPC, the attorney general had essentially withdrawn the Article 10 petition. *Id.* at 2. In the alternative, Plaintiff argued that because his anticipated release date was more than 120 days in the future, the attorney general could not permissibly proceed with an Article 10 petition. *Id.*

On March 20, 2009, Plaintiff filed this action. (Dkt. No. 1)

On June 30, 2009, Plaintiff's motion to dismiss the Article 10 petition was denied. (Defs.' Ex. K.)

Plaintiff was released from DOCS custody to CNYPC on November 2, 2009. Dept. Of Corr. Inmate Information, http://nysdocslookup.docs.state.ny.us (last visited Sept. 30, 2010). As of November 5, 2009, his Article 10 trial had not yet occurred. (Defs.' Exs. L-N.) In fact, nothing in the record before the Court indicates that the Article 10 hearing has ever been conducted. The Court's docket indicates that Plaintiff is still housed at CNYPC.

Plaintiff alleges that his confinement from May 8, 2006, through May 8, 2008, violated the federal due process clause, that Defendant Hogan violated his rights by not holding an Article 10 trial, and that Defendants did not comply properly with Article 9. (Dkt. No. 1 ¶¶ 55, 108-110, 123, 126-129.)

**B.     Conditions at CNYPC**

In addition to alleging that his commitment to CNYPC violated his constitutional and statutory rights, Plaintiff alleges that he has been subjected to unconstitutional and/or illegal conditions of confinement at the facility. I will discuss Plaintiff's allegations about his conditions

of confinement below in Section III (I-N).

### C.      Plaintiff's Prayer for Relief

Plaintiff seeks unspecified injunctive relief, compensatory damages including damages for loss of income and loss of consortium, punitive damages, and a letter of apology.  (Dkt. No. 1 ¶¶ 131-142.)

## II.     LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added).  "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not shown - that the pleader is entitled to relief."  *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."  *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted).

Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).  However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949.

## III.   ANALYSIS

### A.   Plaintiff's Complaint is Not Barred by *Heck v. Humphrey*

Defendants argue that Plaintiff's claims are barred by the rule in *Heck v. Humphrey*, 512 U.S. 477 (1994).  (Dkt. No. 39-1 at 14-15.)  Defendants' argument is without merit.

In *Heck*, the Supreme Court held that:

> in order to recover damages for [an] allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

*Heck*, 512 U.S. at 486-87.  Under *Heck* and its progeny, "a state prisoner's § 1983 action is barred (absent prior invalidation) - no matter the relief sought (damages or equitable relief) . . . -*if* success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005).  If a plaintiff whose success would necessarily demonstrate the invalidity of the confinement or its duration does not satisfy *Heck*'s 'favorable termination' rule, he must seek relief through the federal habeas corpus statute rather than through § 1983.  *Peralta v. Vasquez*, 467 F.3d 98, 104 (2d Cir. 2006) ("[T]he purpose of the

*Heck* favorable termination requirement is to prevent prisoners from using § 1983 to vitiate

collaterally a judicial or administrative decision that affected the overall length of confinement

and that punishments related to their term of imprisonment or the procedures that led to them . . .

must be attacked through a habeas petition.")

To this Court, Defendants' *Heck* argument raises three sub-issues: (1) whether Plaintiff's

civil commitment is a "conviction or imprisonment" within the meaning of *Heck*; (2) whether

success in this civil rights suit would necessarily result in the shortening of Plaintiff's

confinement; and (3) whether the face of the complaint and/or documents of which the Court

may take judicial notice plausibly suggest that "the conviction or sentence has been reversed on

direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to

make such determination, or called into question by a federal court's issuance of a writ of habeas

corpus."

Regarding the first sub-issue, Defendants cite *Huftile v. Miccio-Fonseca*, 410 F.3d 1136,

1140 (9th Cir. 2005) for the proposition that "[c]ourts have recognized that *Heck's* favorable

termination rule also applies in the context of a challenge to an individual's civil commitment."

Defendants have not cited, and I have not been able to find, any decision from the Second Circuit

adopting that position.  (Dkt. No. 39-1 at 15.)  The issue has been raised but not resolved before

the Second Circuit.  In *Vallen v. Connelly*, 36 Fed. App'x 29, 30 (2d Cir. 2002), an unpublished

case, the plaintiff sued social workers under § 1983, alleging that they made false statements that

led to his involuntary commitment.  The district court dismissed the case *sua sponte* as barred by

*Heck*.  *Id*.  The Second Circuit vacated the judgment and remanded for further proceedings,

noting that *Heck* was "not necessarily applicable" in the civil commitment context.  *Id*. at 32.  On

13

remand, the district court granted the defendants' motion for summary judgment on the merits

without addressing *Heck*.  *Vallen v. Connelly*, No.99 CIV. 9947, 2004 U.S. Dist. LEXIS 4490, at

*3-4, 2004 WL 555698, at *3 (S.D.N.Y. Mar. 19, 2004).  The Second Circuit affirmed without

discussing *Heck*.  *Vallen v. Connelly*, 185 Fed. App'x 22 (2d Cir. 2006).  Since *Vallen*, however,

the Supreme Court has cited with approval a very broad definition of "imprisonment":

> Every confinement of the person is an imprisonment, whether it be in
> a common prison or in a private house, or in the stocks, or even by
> forcibly detaining one in the public streets; and when a man is
> lawfully in a house, it is imprisonment to prevent him from leaving
> the room in which he is.

*Wallace v. Kato*, 549 U.S. 384, 388-89 (2007) (*quoting* M. Newell, Law of Malicious

Prosecution, False Imprisonment and Abuse of Legal Process § 2, p. 57 (1892)).  I will thus

assume, for the purposes of this motion, that Plaintiff's challenge to his civil commitment is a

challenge to a "conviction or imprisonment" within the meaning of *Heck*.

Regarding the second sub-issue, Defendants argue without analysis or citation to

authority that "a ruling in [P]laintiff's favor would 'necessarily imply the invalidity' of his

commitment . . . " (Dkt. No. 39-1 at 15.)  Because Plaintiff's complaint does not specify the

injunctive relief Plaintiff seeks, this issue is difficult to analyze.  I note that much of Plaintiff's

complaint complains specifically about the *process* through which he was institutionalized rather

than the fact of his institutionalization.  (*See e.g.* Dkt. No. 1 ¶¶ 120, 123, 126, 128.)  I note

further that no court that has issued a final ruling on the legality of the civil commitment of sex

offenders serving prison sentences has ordered the offenders' immediate release.  Rather, courts

have simply ordered new hearings with greater due process protections.  *See Mental Hygiene*

*Legal Serv. v. Spitzer*, No. 07-Civ.-2935, Dkt. No. 41 (ordering not release, but rather continued

retention of Article 10 detainees absent a request for a new hearing and a ruling at that hearing that retention was inappropriate); *Harkavy I* (ordering new hearings rather than release).  Thus, I find this situation analogous to that in *Wilkinson*, in which two prisoners brought § 1983 actions challenging state parole procedures.  The Supreme Court ruled that the challenges were not barred by *Heck* because success would result only in a new parole hearing, not necessarily in the immediate release of the prisoners.  *Wilkinson*, 544 U.S. at 82.  Therefore, I find that Plaintiff's claims are not barred by *Heck* because a ruling in his favor would not necessarily result in the shortening of Plaintiff's confinement.

Regarding the third sub-issue, Defendants state that "[s]ince . . . the Complaint contains no allegation that any other court has found [Plaintiff's] commitment to be unlawful and ordered his release, *Heck* bars this claim for money damages."  (Dkt. No. 39-1 at 15.)  Defendants' brief does not address the possible implications of the New York Court of Appeals' decision in *Harkavy I* or the Southern District's preliminary injunction in *Mental Hygiene Legal Serv. v. Spitzer*.  As discussed above, *Harkavy I* held that individuals in Plaintiff's circumstances should have been committed pursuant to the procedures set forth in Correction Law § 402 rather than the procedures set forth in Article 9 of the Mental Hygiene Law.  The Court of Appeals directed that individuals, like Plaintiff, who remained civilly committed pursuant to the incorrect procedures be afforded "an immediate retention hearing."  *Harkavy I*, 7 N.Y.3d at 614.  This *suggests* that the portion of Plaintiff's civil commitment between May 8, 2006, (when he was committed to CNYPC pursuant to Article 9 of the Mental Hygiene Law) and November 30, 2006, (when the Oneida County Supreme Court, after a hearing,  ordered his retention at CNYPC) was declared

invalid by a state tribunal authorized to make such determination.[4]

As discussed above, in *Mental Hygiene Legal Serv. v. Spitzer*, the Southern District found that the section of Article 10 of the Mental Hygiene Law authorizing the civil detention of Article 10 respondents from the time of their probable cause hearing to the time of their civil commitment trial without a finding of dangerousness violated due process.  Plaintiff's probable cause hearing was conducted after the Southern District's order in the case but before the preliminary injunction was issued.  The judge who conducted Plaintiff's probable cause hearing did not make a specific finding that Plaintiff was, at that time, dangerous.  Thus, there is an argument that Plaintiff's detention from December 5, 2007, (the date of his Article 10 probable cause hearing) through May 8, 2008, (when Plaintiff was transferred to DOCS custody due to his assault on the CNYPC staff member), has been "declared invalid by a state tribunal authorized to make such determination."

In the absence of briefing from Defendants on the effect of *Harkavy I* and *Mental Hygiene Legal Serv. v. Spitzer*, I find that they have not, at this point in the litigation, carried their burden of showing that *Heck* bars Plaintiff's claims.

B.     Plaintiff's Complaint is Not Barred by *Rooker-Feldman*

Defendants argue that Plaintiff's injunctive relief claim is barred by the *Rooker-Feldman* doctrine.  (Dkt. No. 39-1 at 15-16.)  Defendants' argument is without merit.

The *Rooker-Feldman* doctrine flows from 28 U.S.C. § 1257, which states that in the

---

[4]     This analysis may, at first blush, appear to contradict my analysis of the second sub-issue.  However, a finding that state and federal decisions may have called Plaintiff's commitment into question does not mean that Plaintiff's success in this case would necessarily result in the shortening of his confinement.

federal system only the United States Supreme Court has the power to review state-court

decisions.  Until 2005, the Second Circuit essentially equated *Rooker-Feldman* with the doctrines

of claim and issue preclusion and applied it to bar a wide variety of actions.  *See Moccio v. New*

*York State Office of Court Administration*, 95 F.3d 195, 199 (2d Cir. 1996).  In so doing, the

Second Circuit relied on a footnote in *District of Columbia Court of Appeals v. Feldman*, 460

U.S. 462 (1983), in which the Supreme Court stated that "[i]f the constitutional claims presented

to a United States district court are *inextricably intertwined* with the state court's [decision], then

the district court is in essence being called upon to review the state-court decision."  *Feldman*,

460 U.S. at 483-84 n. 16 (emphasis added).  The Second Circuit applied this "inextricably

intertwined" test not only to federal cases that involved a state-court final judgment, but also to

federal cases that related to interlocutory state court orders.  *Campbell v. Greisberger,* 80 F.3d

703, 707 (2d Cir. 1996).

In 2005, the United States Supreme Court extensively reviewed the way that lower

federal courts were applying the *Rooker-Feldman* doctrine.  *Exxon Mobil Corp. v. Saudi Basic*

*Indus. Corp.*, 544 U.S. 280 (2005).  The Court criticized courts like the Second Circuit that had

applied *Rooker-Feldman* expansively.  The Court clarified that the doctrine should be applied

narrowly[5] and should be "confined to . . . cases brought by state-court losers complaining of

injuries caused by state-court judgments rendered before the district court proceedings

commenced and inviting district court review and rejection of those judgments."  *Exxon Mobil*,

---

[5]        After *Exxon Mobil*, the Second Circuit has noted that the narrowness of the
doctrine's applicability "is evidenced by the fact that the Supreme Court has only applied the
doctrine twice - in the two cases after which the doctrine was named."  *McKithen v. Brown*, 481
F.3d 89, 96 (2d Cir. 2007).

544 U.S. at 281, 125 S.Ct. at 1521-22.

After *Exxon Mobil*, the Second Circuit instituted a new four-part test to determine whether the *Rooker-Feldman* doctrine bars a particular action: (1) the federal court plaintiff lost in state court; (2) the plaintiff complains of injuries caused by the state court judgment; (3) the plaintiff invites district court review and rejection of the state court judgment; and (4) the state court judgment was rendered before the district court proceedings commenced. *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005); *Green v. Mattingly*, 585 F.3d 97, 101 (2d Cir. 2009). The Second Circuit has also suggested that it no longer considers interlocutory orders, particularly those that have been altered by a superceding order and/or of which the loser could not have sought review by the United States Supreme Court, to be 'state court losses' or "state court judgments" within the meaning of the four-part test. *Green*, 585 F.3d at 102.

Defendants do not cite *Exxon Mobil, Hoblock,* or *Green*, mention the Second Circuit's current four-part test, or apply any of that test's factors to Plaintiff's case. Rather, Defendants rely exclusively on the "inextricably intertwined" test, which the Second Circuit has rejected in the wake of *Exxon Mobil*. (Dkt. No. 39-1 at 15-16); *Hoblock*, 422 F.3d at 85 (noting that *Exxon Mobil* overturned the Second Circuit's *Rooker-Feldman* standard); *McKithen,* 481 F.3d at 96 (noting that the Supreme Court, in *Exxon Mobil*, "reject[ed] *Moccio's* approach); *Green*, 585 F.3d at 101 (stating that "[m]uch of our prior case law . . . was abrogated by *Exxon Mobil*."). Therefore, I find that Defendants have not met their burden of showing that they are entitled to dismissal of the complaint on the basis of *Rooker-Feldman*.

Even if the pre-*Exxon Mobil* standard were still applicable, Defendants' brief would have

been insufficient to show that Plaintiff's complaint is barred by *Rooker-Feldman*.  Defendants

devote only one sentence to applying the "inextricably intertwined" test to the facts of this case.

(Dkt. No. 39-1 at 15-16)("In this matter, the plaintiff . . . essentially seeks to relitigate the

probable cause determinations and the decision denying June's motion to dismiss as issued by

the state court.").  In that one sentence, Defendants address only the part of Plaintiff's

confinement attributable to the state court's Article 10 probable cause determination (which

occurred eighteen months after Plaintiff was first confined at CNYPC) and the denial of

Plaintiff's motion to dismiss the Article 10 petition (which occurred more than three years after

Plaintiff was first confined at CNYPC).  This argument does not address Plaintiff's confinement

from May 8, 2006, through November 30, 2006.  During that period, Plaintiff was detained at

CNYPC for sixty days pursuant to Mental Hygiene Law § 9.27 and then for four months pursuant

to Mental Hygiene Law § 9.33(a).  These periods of retention were due solely to the initial

commitment process and Defendant Sawyer's retention application, and thus involved no state-

court action at all.  Therefore, even applying the Second Circuit's former standard, the portion of

Plaintiff's complaint regarding that period of retention is not "inextricably intertwined" with a

state court decision.  Therefore, I find that Defendants have not met their burden of showing that

Plaintiff's complaint is barred by the *Rooker-Feldman* doctrine and I decline to recommend

granting their motion to dismiss on these grounds.[6]

      C.     <u>*Younger* Abstention is not Required</u>

Defendants argue that this Court "should decline to exercise subject matter jurisdiction

---

[6]     Defendants are free, of course, to file another dispositive motion that asserts the *Rooker-Feldman* doctrine and applies the current standard to the peculiar facts of this case.

19

over this action" pursuant to *Younger v. Harris*, 401 U.S. 37 (1971).  (Dkt. No. 39-1 at 16-18.)
Defendants' argument is without merit.

In order for *Younger* abstention to apply, (1) there must be an ongoing state proceeding;
(2) an important state interest must be implicated in that proceeding; and (3) the state proceeding
must afford the federal plaintiff an adequate opportunity for judicial review of the federal
constitutional claims that form the basis for the federal action.  *Diamond "D" Constr. Corp. v.
McGowan*, 282 F.3d 191, 198 (2d Cir. 2002).  *Younger* does not apply to cases challenging the
federal constitutionality of civil commitment of sex offenders, even where Article 10 proceedings
are pending in state court.  *Bailey v. Pataki*, 636 F. Supp. 2d 288, 296-97 (S.D.N.Y. 2009)
("[B]ecause plaintiffs' Article 10 proceedings will not afford them an adequate opportunity for
judicial review of their federal constitutional claims arising out of their commitment pursuant to
Article 9, defendants have failed to demonstrate that the instant actions present the 'exceptional
circumstances' necessary to warrant *Younger* abstention.").  Therefore, I recommend that the
Court decline to apply *Younger* abstention in this case.

   D.    Plaintiff Has Alleged More Than A Mere Violation of State Law

Defendants argue that Plaintiff's complaint should be dismissed because Plaintiff "alleges
merely that [D]efendants employed the wrong New York statute in committing him and/or
violated various state statutes in doing so."  (Dkt. No. 39-1 at 8.)  Defendants correctly note that
"[a]lleged violations of state law do not give rise to liability under § 1983."  (*Id.*, citing *Doe v.
Connecticut Dept. of Youth Servs.*, 911 F.2d 868, 869 (2d Cir. 1990).)  However, Plaintiff's claim
that he was wrongfully committed is not merely a state law claim.  As discussed below,
Plaintiff's claim has federal due process implications.  Therefore, I recommend that the Court

20

reject Defendants' argument that Plaintiff's claims involve only matters of state law that do not give rise to liability under § 1983.

     E.    <u>Plaintiff Has Stated a Due Process Claim and Defendants Are Not Entitled to Qualified Immunity</u>

Defendants argue that the complaint fails to state a due process claim (Dkt. No. 39-1 at 9) and that, even if it does, they are entitled to qualified immunity (Dkt. No. 39-1 at 11-13). I find that Plaintiff has stated a due process claim and that Defendants are not entitled to qualified immunity at this stage in the proceedings.

     1.    *Plaintiff Has Stated a Due Process Claim*

Defendants argue that Plaintiff's complaint fails to state a due process claim. (Dkt. No. 39-1 at 9.) District courts in the Second Circuit have uniformly held that prisoners who were transferred to CNYPC or similar institutions pursuant to Mental Hygiene Law § 9.27 were deprived of due process, or at least that a complaint raising this allegation is sufficiently strong to survive a motion to dismiss. *Bailey,* 2010 WL 2671462, at *8 (stating that "the procedures used for plaintiffs' involuntary commitment rather blatantly violated plaintiffs' constitutional rights" and denying defendants' motion for summary judgment); *Bailey v. Pataki*, 636 F. Supp. 2d 288 (S.D.N.Y. 2009) (denying motion to dismiss); *Bloomfield v. Wurzberger*, No. 9:08-CV-619 GLS/RFT, 2009 U.S. Dist. LEXIS 95924, 2009 WL 3335892 (N.D.N.Y. Oct. 15, 2009) (denying motion to dismiss); *Lane*, 2009 WL 3074344 (finding that prisoner was deprived of due process but granting summary judgment to defendants on qualified immunity grounds); *Wheeler v. Pataki*, No. 9:07-CV-0892 TJM/GHL, 2009 U.S. Dist. LEXIS 19343, 2009 WL 674152 (N.D.N.Y. Mar. 11, 2009) (denying motion to dismiss); *Abdul-Matiyn v. Pataki*, No. 9:06-CV-

21

1503 DNH/DRH, 2008 U.S. Dist. LEXIS 28670, 2008 WL 974409 (N.D.N.Y. Apr. 8, 2008)

(denying motion to dismiss).[7]  I concur with these courts.  Therefore, I recommend that the Court

reject Defendants' argument that Plaintiff has failed to state a due process claim.

2.    *Defendants Are Not Entitled to Qualified Immunity*

Defendants argue that they have qualified immunity against Plaintiff's due process claim

for money damages.  (Dkt. No. 39-1 at 11-13.)

"[U]sually, the defense of qualified immunity cannot support the grant of a [Rule]

12(b)(6) motion for failure to state a claim upon which relief can be granted."  *McKenna v.*

*Wright*, 386 F.3d 432, 435 (2d Cir. 2004) (citation omitted).  However, the qualified immunity

defense may "be asserted on a Rule 12(b)(6) motion as long as the defense is based on facts

appearing on the face of the complaint."  *McKenna*, 386 F.2d at 436.

The qualified immunity inquiry generally involves two issues: (1) "whether the facts,

viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2)

"whether it would be clear to a reasonable officer that his conduct was unlawful in the situation

he confronted." *Sira v. Morton*, 380 F.3d 57, 68-69 (2d Cir. 2004) (citations omitted); *accord*

*Higazy v. Templeton*, 505 F.3d 161, 169 n.8 (2d Cir. 2007) (citations omitted). Courts may

exercise their sound discretion in deciding which of the two prongs should be addressed first, in

light of the circumstances in the particular case at hand.  *Pearson v. Callahan*, 129 S. Ct. 808,

---

[7]    The Court will provide Plaintiff with copies of these unpublished decisions in accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).  Defendants served a copy of *Lane* on Plaintiff with their moving papers.  (Dkt. No. 39-2.)

817 (2009).

Here, as discussed above, the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation.  I will therefore consider the second factor - whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted.

In determining  whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted, courts in this Circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity';
> (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and
> (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991) (citations omitted), *cert. denied*, 503 U.S. 962 (1992).

Defendants argue that "the right to be committed under Section 402 rather than MHL § 9.27" was not defined with reasonable specificity or clearly established by the Second Circuit or the Supreme Court at the time of Plaintiff's initial commitment to CNYPC in May 2006.  (Dkt. No. 39-1 at 11.)  To the contrary, I find that the right was defined with reasonable specificity and was supported by the decisional law of the Supreme Court.  More than twenty-five years before Plaintiff's commitment, the United States Supreme Court held in *Vitek v. Jones* that prisoners are entitled to substantial procedural protections before being transferred from a standard prison facility to a psychiatric facility.  *Vitek v. Jones*, 445 U.S. 480 (1980).  The full range of protections described in *Vitek* were not made available to Plaintiff, or indeed to any prisoner facing commitment under the auspices of the Mental Hygiene Law.

The third factor is the difficult one in this case.  "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy*, 505 F.3d at 169-70 (citations omitted).  This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

District courts in the Second Circuit are split as to whether defendants in cases such as this one acted objectively reasonably by following Mental Hygiene Law Article 9 rather than Correction Law § 402.  In *Lane*, relied upon by Defendants, the court stated that:

> Although I have determined that plaintiff's right to due process was violated when he was involuntarily committed to CNYPC, I also find that the inability of state officials, including defendants and any DOCS official that may have been involved, to rely on MHL § 9.27 was not clearly established at that time. At the time of plaintiff's commitment the Court of Appeals had not yet decided *Harkavy*. Indeed, before plaintiff's commitment, the New York State Supreme Court Appellate Division, First Department, in that case had endorsed the DOCS' ability to utilize MHL § 9.27, finding that provision to be consonant with the petitioners' Fourteenth Amendment rights to due process. *Harkavy v. Consilvio,* 29 A.D.3d 221, 812 N.Y.S.2d 496 (1st Dep't 2006). In addition to the unsettled state of the law in New York, it appears that no federal court decision had been issued forecasting the ultimate finding in *Harkavy* before plaintiff's confinement to CNYPC. In fact, prior to *Harkavy,* the Second Circuit had generally approved of MHL § 9.27 as meeting both substantive and procedural due process requirements. *See, e.g., Project Release v. Provost,* 722 F.2d 950, 972-975 (2d Cir.1983). Accordingly, I conclude that the parameters of plaintiff's constitutional right to due process were not clearly established at the time of his commitment and that, as a matter of law, it was objectively reasonable for defendants, as well as the DOCS, to rely on MHL § 9.27 in committing plaintiff to CNYPC. I therefore recommend a finding that, to the extent that any of the

24

> defendants were involved in the decision to commit plaintiff to
> CNYPC on his parole release date, they are entitled to qualified
> immunity with respect to plaintiff's claims for violation of his
> Fourteenth Amendment rights to due process, in light of the fact that
> it was objectively reasonable for them to believe that they were acting
> in a manner that did not violate any of plaintiff's protected rights.

*Lane*, 2009 WL 3074344, at *11.[8]

In contrast to the *Lane* decision, the district courts in *Bailey*, 636 F. Supp. 2d 288, and

*Bloomfield*, 2009 WL 3335892, rejected the defendants' qualified immunity arguments at the

motion to dismiss stage.  The *Bailey* court observed that, in light of *Vitek*, "it is beyond cavil that,

at the time of their transfer and involuntary commitment, plaintiffs were entitled to certain pre-

transfer procedural safeguards, including notice, an opportunity to be heard, and a psychiatric

evaluation by court-appointed doctors, and that defendants could not have reasonably believed

that their concomitant failure to provide such safeguards was lawful."  *Bailey*, 636 F. Supp. 2d at

294.  The court stated that even lower-ranking officials, such as the certifying doctors, "could not

have reasonably believed that the perfunctory procedures here provided . . . remotely comported

with elementary fairness and due process."  *Id*.

In *Bloomfield*, the defendants "seem[ed] to suggest that . . . the only statutory scheme in

place was Article 9 [and] therefore they [were] immune from suit having relied on a

presumptively valid statute."  *Bloomfield*, 2009 WL 3335892 at * 8.  This argument, the court

stated:

> overlook[s] the fact that Correction Law § 402 was also in place at
> the time in question, yet they opted to not follow that equally

---

[8]     I note that Judge Peebles' Report-Recommendation in *Lane* was issued at the
summary judgment stage.

presumptively valid statute. . . . Whether Defendants are entitled to qualified immunity for relying on one law over another depends, in our view, on whether the rights Plaintiff asserts he was entitled to were clearly established as of his involuntary admission. We find that they were. Indeed, as early as 1980, the Supreme Court ruled that the involuntary transfer of a prisoner to a mental hospital implicates a liberty interest protected by the Fourteenth Amendment's Due Process Clause. *Vitek v. Jones,* 445 U.S. 480 (1980). . . . New York State Corrections Law appears to satisfy the clearly established procedures set forth in *Vitek,* while Article 9 does not.  In this regard, we find that at this stage, Defendants' reliance on Article 9 as the only protections available to be misplaced.  At the very least, it is questionable at this stage whether their reliance on Article 9 as the sole avenue was reasonable.

*Bloomfield*, 2009 WL 3335892, at *8-9.  I agree with the *Bailey* and *Bloomfield* courts that it was

not necessarily reasonable for Defendants to rely on Article 9 in May 2006, and therefore

recommend that the Court deny Defendants' motion to dismiss on the basis of qualified

immunity.[9]

      F.    <u>The Complaint Does Not State a Claim for False Imprisonment</u>

Defendants argue that the complaint does not state a false imprisonment claim because

Plaintiff's "confinement was privileged and undertaken pursuant to Supreme Court orders of

commitment and findings of probable cause."  (Dkt. No. 39-1 at 9.)  Defendants are correct.

The elements of a § 1983 false imprisonment claim, which are "almost identical" to a

false imprisonment claim under New York law, are: (1) the defendant intended to confine the

plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to

the confinement; and (4) the confinement was not otherwise privileged.  *Weyant v. Okst*, 101

---

[9]    As is true throughout their brief, Defendants' qualified immunity argument does not explicitly address the portions of Plaintiff's confinement attributable to Mental Hygiene Law § 9.33 and Article 10.  Given the odd facts of this case, I suggest that Defendants do so in any future dispositive motions.

F.3d 845, 853 (2d Cir. 1996); *Ferretti v. Town of Greenburgh*, 595 N.Y.S.2d 494, 496-97, 191

A.D.2d 608, 610 (N.Y. App. 2d Div. 1993).  "Commitment pursuant to Mental Hygiene Law

[A]rticle 9 is privileged in the absence of medical malpractice."  *Feretti*, 191 A.D.2d at 610.

Here, the complaint as currently pleaded does not allege any facts plausibly suggesting that

Defendants committed medical malpractice.  Therefore, Plaintiff has not stated a false

imprisonment claim and I recommend that the Court grant Defendants' motion to dismiss the

claim.

      Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not

dismiss without granting leave to amend at least once when a liberal reading of the complaint

gives any indication that a valid claim might be stated."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112

(2d Cir. 2000) (internal quotation and citation omitted).  Plaintiff has not amended his complaint

in this action and there is an indication that he might be able to state a false imprisonment claim.

Therefore, I recommend that the Court dismiss Plaintiff's false imprisonment claim with leave to

amend.

      G.    <u>The Complaint Does Not State a Claim Against Blair</u>

      The complaint alleges that Defendant Blair signed Plaintiff's parole papers, ripped them

out of Plaintiff's hands, returned an hour later to throw the papers at Plaintiff, and left without

explanation.  (Dkt. No. 1 ¶ 22-23.)  When Defendant Blair returned the papers, they had been

altered to show that Plaintiff would be released to CNYPC rather than an apartment in Union

Center.  *Id*. ¶¶ 24-26.  Defendants argue that Plaintiff's claim against Defendant Blair must be

dismissed for lack of any personal involvement in a constitutional violation.  (Dkt. No. 39-1 at

19-20.)  Defendants are correct.

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.  *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Here, the complaint does not allege facts plausibly suggesting that Defendant Blair was personally involved in the decision to commit Plaintiff to CNYPC pursuant to Mental Hygiene Law Article 9 or in any other alleged constitutional violation.  Therefore, I recommend that the Court dismiss the claim against Defendant Blair with leave to amend.

H.     The Complaint's Allegations Regarding Verbal Harassment Do Not State a Claim

The complaint alleges that several Doe Defendants verbally harassed Plaintiff.  (Dkt. No. 1 ¶¶ 14, 15, 18.)  Defendants move to dismiss these claims, arguing that such claims are not actionable.  (Dkt. No. 39-1 at 20.)  Defendants are correct.

"It is well established that mere threatening language and gestures of a custodial officer do not  . . . amount to constitutional violations." *Alnutt v. Cleary*, 913 F. Supp. 160, 165 (W.D.N.Y. 1996)(punctuation omitted).  Therefore, I recommend that the Court dismiss these claims without leave to amend.

I.     The Complaint's Allegations Regarding Grievances Do Not State a Claim

Plaintiff alleges that CNYPC does not have a grievance system and that he "attempted addition[a]l resources" to raise his concerns.  (Dkt. No. 1 ¶ 7.)  Plaintiff alleges that on February 3, 2008, he wrote Defendant Michael Hogan a letter complaining that legal rights were being

violated at CNYPC.  (Dkt. No. 1 ¶ 47.)  Plaintiff never received a response.  *Id.* ¶ 57.  Defendants

move to dismiss these claims, arguing that there is no constitutional right to have a grievance

heard or to receive a response to complaints.  (Dkt. No. 39-1 at 21-22.)  Defendants are correct.

     The constitutional provision applicable to involuntarily committed patients is the

Fourteenth Amendment, which requires the state to assume responsibility for the safety and well-

being of people in its custody.  *Cerbelli v. City of New York*, 600 F. Supp. 2d 405, 413 (E.D.N.Y.

2008) (*citing Youngberg v. Romeo*, 457 U.S. 307, 315 (1982)).  Under the Fourteenth

Amendment, the state is required to provide adequate food, clothing, and medical care.

*Youngberg*, 457 U.S. at 315.  The Fourteenth Amendment's due process clause requires the state

to provide civilly committed patients with protections at least as extensive as those to which state

prisoners are entitled.  *Sain v. Wood*, 512 F.3d 886, 893 (7th Cir. 2008); *McChesney v. Hogan*,

No. 9:08-CV-0163 (FJS/DEP), 2010 U.S. Dist. LEXIS 92948, at *26-27, 2010 WL 3602660, at

*9 (N.D.N.Y. Aug. 17, 2010).[10]  In the prison context, the law is well-settled that:

> [I]nmate grievance programs created by state law are not required by
> the Constitution and consequently allegations that prison officials
> violated those procedures does not give rise to a cognizable § 1983
> claim.  *Cancel v. Goord*, No. 00 Civ.2042, 2001 WL 303713, *3
> (S.D.N.Y. Mar. 29, 2001).  If prison officials ignore a grievance that
> raises constitutional claims, an inmate can directly petition the
> government for redress of that claim.  *See Flick v. Alba*, 932 F.2d
> 728, 729 (8th Cir. 1991).  "Therefore, the refusal to process an
> inmate's grievance or failure to see to it that grievances are properly
> processed does not create a claim under § 1983."  *Cancel*, 2001 WL
> 303713, at *3; *see also Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342
> (S.D.N.Y.2003); *Mahotep v. DeLuca*, 3 F. Supp. 2d 385, 390
> (W.D.N.Y. 1998).

---

[10]    The Court will provide Plaintiff with a copy of this unpublished decision in
accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

*Shell v. Brzeniak,* 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005).  Therefore, I recommend that the Court dismiss Plaintiff's claims regarding the grievance system at CNYPC without leave to amend.

       J.       <u>The Complaint Does Not State a Claim for Denial of Access to the Courts</u>

       Plaintiff  alleges that he was denied access to attorneys and the courts.  (Dkt. No. 1 ¶¶ 52-53, 62, 73, 100.)  Defendants move to dismiss these claims, arguing that Plaintiff has not stated a claim because he has not alleged facts plausibly suggesting that he suffered any actual injury. (Dkt. No. 39-1 at 22-23.)  Defendants are correct.

       Patients at CNYPC, "like convicted inmates, enjoy a First Amendment right of meaningful access to the courts."  *McChesney*, 2010 WL 3602660, at *13.  "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir. 1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821-23 (1977)).  This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F. Supp. 713, 725 (S.D.N.Y. 1993) (citing *Pickett v. Schaefer,* 503 F. Supp. 27, 28 (S.D.N.Y. 1980)).  To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury.  *Lewis v. Casey*, 518 U.S. 343, 353 (1996); *Howard v. Leonardo*, 845 F. Supp. 943, 946 (N.D.N.Y. 1994) (Hurd, M.J.).

Here, Plaintiff has not alleged that he suffered any actual injury from the alleged restrictions on and denials of access to the courts.  For example, he has not alleged that any portion of his continued confinement was caused by any inability to contact his Mental Hygiene Legal Service attorneys regarding his Article 9 or Article 10 proceedings.  Therefore, I recommend that the Court dismiss these claims with leave to amend.

> K.       The Complaint Does Not State a Fourth Amendment Claim

Plaintiff's complaint alleges that several Defendants conducted searches and seizures of his person and his cell, including strip searches conducted "in open areas."  (Dkt. No. 1 ¶¶ 58, 61, 101-103.)  During one of the cell searches, unnamed persons "violently ripped up" pictures of Plaintiff's deceased son and threw them in his face.  *Id.* ¶ 101.   Defendants move to dismiss these claims, arguing that Plaintiff has not stated a Fourth Amendment claim.  (Dkt. No. 39-1 at 23.)  Defendants are correct.

The Fourth Amendment prohibits "unreasonable" searches.  As Defendants note, "involuntarily committed persons have no right to privacy in their cells" and therefore cannot challenge a cell search under the Fourth Amendment.  *Lombardo v. Holanchock*, No. 07 Civ. 8674 (DLC), 2008 U.S. Dist. LEXIS 48753, at *25, 2008 WL 2543573, at *8 (S.D.N.Y.  Jun. 24, 2008).[11]  Therefore, I recommend that the Court dismiss Plaintiff's claims regarding cell searches without leave to amend.

---

[11]        The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

Plaintiff does, however, retain a Fourth Amendment right against some searches of his body.  Body searches, even strip searches, are constitutional if they are reasonably related to a legitimate governmental goal and are conducted in a reasonable manner.  *See Frazier v. Ward*, 528 F. Supp. 80, 81 (N.D.N.Y. 1981); *Aiken v. Nixon*, 236 F. Supp. 2d 211, 231-34 (N.D.N.Y. 2002).  "However, a . . . search is unconstitutional if it is unrelated to any legitimate [governmental] goal or if it is designed to intimidate, harass, or punish.  *See, e.g., Iqbal v. Hasty*, 490 F.3d 143, 172 (2d Cir. 2007) (pretrial detainee alleged Fourth Amendment violation where he was subjected to repeated strip and body cavity searches that were not related to legitimate government purposes and designed to punish); *Covino*  [*v. Patrissi*, 967 F.2d 73, 80 (2d Cir. 1992)](strip search accompanied by physical and verbal abuse is unconstitutional); *Hodges v. Stanley*, 712 F.2d 34, 35-36 (2d Cir. 1983) (second strip search performed soon after a first strip search served no legitimate interest when prisoner was under continuous escort); *Jean-Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 323 (S.D.N.Y.2006)."  *Miller v. Bailey,* No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, at *1, 2008 WL 1787692, at *9 (E.D.N.Y. Apr. 17, 2008).[12]

Here, Plaintiff alleges that unnamed persons "stripped [him] completely naked in the presence of at least three or four [Therapy Assistants] and openly humiliated [and] embarrassed [him] in open areas."  (Dkt. No. 1 ¶ 102.)  Plaintiff alleges that Defendant Nowicki "was fully aware of th[is] fact."  *Id*.  Because Plaintiff has not named any of the individuals (even as Doe Defendants) who allegedly strip-searched him, I recommend that the Court dismiss these claims with leave to amend.  As to Defendant Nowicki, I find that the complaint does not sufficiently

---

[12]     The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

allege that he was personally involved in the alleged constitutional violation and recommend that the Court dismiss the claim with leave to amend.

      L.     <u>The Complaint Does Not State a Claim Regarding Alleged Violations of the Mental Hygiene Law or the Patient Bill of Rights</u>

Plaintiff alleges that Defendants violated various provisions of the Mental Hygiene Law governing conditions at CNYPC and various provisions of the "Patient's Bill of Rights."  (Dkt. No. 1 ¶¶ 33, 48-49, 54, 56, 63, 70, 104, 111-12.)  Defendants move to dismiss these claims. (Dkt. No. 39-1 at 24.)  "No private cause of action is authorized for violations of the Mental Hygiene Law." *Lombardo*, 2008 WL 2543573, at *10 (quoting *McWilliams v. Catholic Diocese of Rochester*, 536 N.Y.S.2d 285, 286 (N.Y. App. Div. 4th Dept. 1988)).  Moreover, as noted above, alleged violations of state law do not give rise to liability under § 1983.  *Doe v. Connecticut Dept. of Youth Servs.*, 911 F.2d 868, 869 (2d Cir. 1990).  Therefore, I recommend that the Court dismiss these claims with leave to amend.

      M.     <u>The Complaint Does Not State a Claim Against Defendants Scolosser and Farum</u>

Plaintiff alleges that Defendants violated his right to privacy by disclosing information that "they knew or should have known was false."  (Dkt No. 1 ¶ 105.)  This may be a reference to Plaintiff's assertion that Defendant Scolosser, acting in concert with Defendant Farum, offered testimony at Plaintiff's Article 9 hearing that "intentionally twist[ed] certain facts" about Plaintiff. (Dkt. No. 1 ¶¶ 80-82, 88-92.)

In their reply brief[13], Defendants argue that this claim is without merit because "[t]he mere allegations that a defendant has given false testimony at a hearing fails to support a section

---

      [13]     The Court would generally not address arguments first raised in a reply brief, but Plaintiff filed a sur-reply addressing Defendants' arguments.  (Dkt. No. 58.)

1983 claim for damages against the witness providing such testimony."  (Dkt. No. 56 at 8.)

Defendants are correct.  *See Briscoe v. LaHue*, 460 U.S. 325, 342-43 (1983) (holding that § 1983

does not authorize damages claims against police officers giving perjured testimony at criminal

trials both on the basis of common law traditions of private witness immunity and because

"[s]ubjecting government officials . . . to damages liability under § 1983 for their testimony

might undermine not only their contribution to the judicial process but also the effective

performance of their other public duties.").  *Briscoe*'s reasoning has been extended to shield

correctional officers from suit for allegedly offering false testimony at prison disciplinary

proceedings.  *Green v. Greene*, No. 9:07-CV-0351 (GTS/DEP), 2009 U.S. Dist. LEXIS 68193, at

*28, 2009 WL 5874308 (N.D.N.Y. Mar. 30, 2009).[14]  The reasoning is equally applicable to

claims against employees of the State Office of Mental Health regarding testimony in civil

commitment proceedings.  *See e.g. Easton v. Sundram*, No. 89 CIV. 1839, 1990 U.S. Dist.

LEXIS 8637, at *10-11, 1990 WL 102231, at *4 (S.D.N.Y. Jul. 13, 1990).[15]  Therefore, I

recommend that the Court dismiss the claims against Defendants Scolosser and Farum.

     N.    <u>Claims Not Addressed by Defendants</u>

Plaintiff's complaint includes several allegations that Defendants' motion to dismiss does

not address.  The majority of these claims relate to CNYPC policies and procedures affecting

Plaintiff's daily activities.

---

[14]    Defendants served a copy of this unpublished case on Plaintiff.  (Dkt. No. 57.)

[15]    The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

First, Plaintiff alleges that Defendant Hogan placed him in a disciplinary unit "with no substantial physician written order."  *Id.* ¶ 50.  Plaintiff alleges that in the disciplinary unit he was restrained to the day room for fourteen hours per day, restricted from activity centers and recreation, denied access to the "treatment mall to engage in treatment programs," denied nightly movie viewing, and denied arts and crafts opportunities.  *Id.* ¶ 51.[16]

Second, Plaintiff alleges that Defendants interfered with his incoming and outgoing mail (Dkt. No. 1 ¶¶ 52-43) and that the Mental Hygiene Legal Service agreed with Plaintiff that there was a problem with CNYPC's "total prohibition on packages coming into the facility via mail." *Id.* ¶ 69

Third, Plaintiff alleges that CNYPC's telephone policy violated his rights by, *inter alia*, placing a limit of $20.00 per month on calling cards for personal calls.  (Dkt. No. 1 ¶ 71.)

Fourth, Plaintiff alleges that Defendants limited his access to local newspapers, periodicals, and television news.  (Dkt. No. 1 ¶ 74.)

Fifth, Plaintiff alleges that he was denied appropriate clothing.  (Dkt. No. 1 ¶ 76.)

Sixth, Plaintiff alleges that he was, on many occasions, "abused by the usage of shackles and handcuffs."[17]  (Dkt. No. 1 ¶ 77, 113.)

Seventh, Plaintiff alleges that Defendants failed to properly address his dental problems. (Dkt. No. 1 ¶¶ 78-79.)

---

[16]     Defendants cite these paragraphs of the complaint in the section of their brief dealing with Plaintiff's allegations that Defendants violated the Mental Hygiene Law.  (Dkt. No. 39-1 at 24.)  Defendants do not address this allegation as a potential due process cause of action.

[17]     In his sur-reply, Plaintiff appears to assert different allegations of excessive force. (Dkt. No. 58.)  If Plaintiff wishes to proceed with those claims, he must either move to amend the complaint in this action or file a new civil action.

Patients in psychiatric centers enjoy "constitutionally protected interests in reasonably nonrestrictive confinement conditions." *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982). To determine whether a particular condition of confinement at a psychiatric center complies with constitutional standards, a court must balance "the individual's interest in liberty against the state's asserted reasons for restraining individual liberty." *Id*. at 320. Here, the Court cannot weigh these factors because Defendants have not addressed Plaintiff's allegations. As a result, they have not asserted arguments or introduced evidence about their reasons for the policies Plaintiff challenges. Therefore, I recommend that the Court find these claims sufficient to survive *sua sponte* review.

Finally, Plaintiff alleges that Defendant Jeffery Nowicki, as Plaintiff's treatment leader, had "full or partial responsibility for the plaintiff's treatment." (Dkt. No. 1 ¶ 95.) "Plaintiff alleges that he presented many types of concerns to defendant Nowicki as part of a problem resolution process in order to redress both personal and house unit issues." *Id*. ¶ 97. "Plaintiff alleges that defendant Nowicki made up and instituted his 'version' of house rules and provided many 'can't' do issues. These 'can't' do issues are independent of the Rights of Inpatients in New York State Office of Mental Health Psychiatric Centers." *Id*. ¶ 97. "Plaintiff alleges that defendant Nowicki, as Treatment Team Leader, dictated what[]ever policy and rules and/or rights would be followed or honored. Defendant Nowicki did not adhere to the fact that the plaintiff who was a bonafide patient in a psychiatric center could not by itself as grounds to deprive the plaintiff of many of his civil rights ." *Id*. ¶ 98. Plaintiff asked Defendant Nowicki to "assist him with family matters," but Defendant Nowicki refused. *Id*. ¶ 99.

None of Plaintiff's allegations about Defendant Nowicki plausibly suggest that Defendant Nowicki violated Plaintiff's civil rights.  Therefore, I recommend that the Court dismiss the claims against Defendant Nowicki *sua sponte*.

**ACCORDINGLY**, it is

**ORDERED** that the Clerk provide Plaintiff with copies of *Bailey v. Pataki,* 2010 WL 2671462 (S.D.N.Y. Jul. 6, 2010); *Bloomfield v. Wurzberger*, No. 9:08-CV-619 GLS/RFT, 2009 U.S. Dist. LEXIS 95924, 2009 WL 3335892 (N.D.N.Y. Oct. 15, 2009); *Wheeler v. Pataki*, No. 9:07-CV-0892 TJM/GHL, 2009 U.S. Dist. LEXIS 19343, 2009 WL 674152 (N.D.N.Y. Mar. 11, 2009); *Abdul-Matiyn v. Pataki*, No. 9:06-CV-1503 DNH/DRH, 2008 U.S. Dist. LEXIS 28670, 2008 WL 974409 (N.D.N.Y. Apr. 8, 2008); *McChesney v. Hogan*, No. 9:08-CV-0163 (FJS/DEP), 2010 U.S. Dist. LEXIS 92948, 2010 WL 3602660 (N.D.N.Y. Aug. 17, 2010); *Lombardo v. Holanchock*, No. 07 Civ. 8674 (DLC), 2008 U.S. Dist. LEXIS 48753, 2008 WL 2543573 (S.D.N.Y.  Jun. 24, 2008); *Miller v. Bailey,* No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, 2008 WL 1787692 (E.D.N.Y. Apr. 17, 2008); and *Easton v. Sundram*, No. 89 CIV. 1839, 1990 U.S. Dist. LEXIS 8637, at *10-11, 1990 WL 102231, at *4 (S.D.N.Y. Jul. 13, 1990) in accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 39) be **GRANTED IN PART AND DENIED IN PART**.  I recommend that the Court (1) direct Defendants Hogan, Sawyer, Maxamillion, and Peroni  to answer Plaintiff's due process claim regarding his confinement at CNYPC from May 8, 2006, through May 6, 2008; (2) grant Defendants' motion to dismiss Plaintiff's false imprisonment claim with leave to amend; (3) grant Defendants' motion to dismiss all claims against Defendant Blair with leave to amend; (4) grant

Defendants' motion to dismiss any claims based solely on verbal harassment without leave to amend; (5) grant Defendants' motion to dismiss any claims regarding CNYPC's grievance system or the failure of individual Defendants to respond to Plaintiff's grievances without leave to amend; (6) grant Defendants' motion to dismiss the claims regarding denial of access to the courts with leave to amend; (7) grant Defendants' motion to dismiss Plaintiff's Fourth Amendment claims without leave to amend as to cell searches and with leave to amend as to strip searches; (8) grant Defendants' motion to dismiss the claims in Paragraphs 33, 48-49, 54, 56, 63, 70, 104, and 111-12 with leave to amend; (9) dismiss the claims against Defendants Scolosser and Farum with leave to amend; (10) direct Defendants Hogan, Sawyer, Maxamillion, and Peroni to answer Plaintiff's claims regarding the disciplinary unit, mail policies, telephone policies, media policies, clothing policies, the use of shackles, and dental care; and (11) *sua sponte* dismiss the claims against Defendant Nowicki with leave to amend.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated: September 30, 2010
        Syracuse, New York

George H. Lowe
United States Magistrate Judge